419 P.2d 505

Charles BRASHER and Bessie Brasher, husband and wife, Byrt M. Waller and Lucille M. Waller, husband and wife, Appellants,

v.

Keaton GIBSON, Appellee.*

No. 8058–PR.

Supreme Court of Arizona.

In Banc.

Oct. 19, 1966.

*·Opinions of the Court of Appeals, Div. 1, 2 Ariz.App. 91, 406 P.2d 441, and 2 Ariz.App. 507, 410 P.2d 129, vacated.

Westover, Copple, Keddie & Choules, Yuma, for appellants.

Brandt & Baker, Yuma, for appellee.

Ozell M. Trask, John Geoffrey Will, Phoenix, for Arizona Interstate Stream Commission, amici curiæ.

STRUCKMEYER, Chief Justice.

This is an action by Charles Brasher and Bessie Brasher, his wife, and Byrt M. Waller and Lucille M. Waller, his wife, against Keaton Gibson seeking an injunction to prevent the obstruction and diversion of waters of the Colorado River and to recover actual and punitive damages. The trial court entered judgment in favor of the defendant, denying plaintiffs all relief. The judgment was reversed in the Court of Appeals, 2 Ariz.App. 91, 406 P.2d 441, and 2 Ariz.App. 507, 410 P.2d 129. Opinions of the Court of Appeals ordered vacated.

The area in dispute concerns a portion of the bottom lands adjacent to the Colorado River, called by the parties Cibola Lake. Near Cibola Lake, the Colorado River, which in general runs in a north-south direction, makes a U bend. The lake lies principally within this bend. See attached overlay to aerial photograph, plaintiffs' Exhibit 11. The land in the bend on both sides of the lake is owned by the United States Government with the exception of one lot and forty acres owned by defendant and forty acres leased by plaintiffs. Both plaintiffs and defendant are engaged in the businesses of trailer parks and fishing camp rentals.

Prior to the completion of Hoover Dam in 1935, the Colorado River overflowed the

328

Legend
A Gibson's Property
B Brashers' Property
C Turnout

lands in the Cibola Lake area in the spring of the year. A series of washes and a slough, some three miles long, existed where the waters left the main channel. In the late spring or early summer, when the river ceased flooding, the water receded through the slough. Defendant's predecessors in interest, who acquired title in 1928 by patent from the United States Government under the Homestead Act of 1862, farmed the bottom lands.

In 1938, a diversion dam, the Imperial Dam, was completed downstream from the defendant's property. Its purpose is this: For irrigation, water is in demand in the spring, summer and early fall of the year. Accordingly, at that time of the year, water is released into the main channel of the Colorado River from Hoover Dam. The water is released in the daytime to generate electricity and it reaches the Imperial Dam at night, building up behind the dam until it is high enough to flood into the slough and overflow the lands formerly farmed during the summer. During the late fall and winter, the river is low because there is little release of water and, consequently, the water will not escape from the main stream. In recognition of the property rights invaded by the flooding, the United States Government, in 1944, purchased from the defendant's predecessors in interest a perpetual easement to overflow.

In 1955, defendant purchased the property and, the same year, approximately 400 yards south of his property line and on government lands, constructed a levee, now 600 feet across, 40 feet at the base and 7 feet at the top. This levee impounded the waters which flowed into the slough and overflowed onto the adjacent lands, thereby creating what is known as Cibola Lake. In the spring of 1958, following the washing out of the levee in the summer of 1957, defendant went north to the point marked C on the overlay and constructed an intake structure to control the waters flowing in and out of the bottom lands. This facility was rebuilt at a slightly different location in 1959, at which time defendant bulldozed

a channel to permit the water to flow freely into the lake area. Thereafter, the lake was maintained at as uniformly a high level as possible. In the winter time, defendant has been unable to take water out of the river because of lack of sufficient flow and the lake gradually recedes from evaporation and seepage until the spring water deliveries commence.

The plaintiffs leased their land and commenced the operation of their trailer park and fishing camp in 1960. In the winter of 1961–1962, the water in the lake became so low that "a person could wade across to the river" at the defendant's property. Accordingly, in January and February of 1962, defendant began the construction of a dike on the location of his north property line, running in an east-west direction across the lake. The avowed function of this dike is to permit the retention of water in the lower part of the lake during periods of low water delivery. It is acknowledged by the plaintiffs that the construction of the proposed dike would not prevent the flow of water into the north portion of the lake for the reason that the water flows from north to south, entering the lake principally through the turnout structure built by defendant. But the dike would prevent access to the south portion of the lake across defendant's property.

As stated, plaintiffs sought to prevent the obstruction and diversion of the waters entering from the Colorado River; meaning, both the flow through the turnout and the dike which defendant was then building. The trial court found that the plaintiffs did not sustain any legal damage by reason of the construction and use of the turnout structure, nor by the construction of the dike upon the north property line of the defendant's patented lands. It concluded that, as a matter of law, the construction of the dike was lawful and that, accordingly, no grounds existed for injunctive relief.

Plaintiffs first urge that the slough and the washes here under consideration are natural water courses, a point we do not

find necessary to decide since it does not control the disposition of this case.

■ Plaintiffs alleged in their complaint and assert on appeal that they are a riparian owner and that as a riparian owner they are entitled to enjoy the whole of the lake with all the owners in common. Plaintiffs err. The Constitution of the State of Arizona, A.R.S. is the fundamental law of this jurisdiction. It provides, by Article 17, that "The common law doctrine of riparian water rights shall not obtain or be of any force or effect in the State." This does not mean that sometimes the riparian water rights doctrine has no force or effect in Arizona, nor does it mean that the courts will enforce the provisions of the constitution as is deemed expedient. It means that the doctrine shall not obtain nor shall it be of any force or effect in the state. *Ever.*

■ It is plain that the defendant has, by the construction of the levee to the south of his property and the consequential damming of the waters draining through the slough, created an artificial lake. Defendant would have the right to fence his land in its natural state, preventing the intrusion of hunters or others, and for the same reason can contain water upon its surface, creating an artificial pond or lake, protecting himself against trespassers by boats by the construction of a dike or levee. Plaintiffs have no right to enter upon defendant's land simply because there has been water impounded upon its surface.

■ Where the owner of land has created an artificial lake or pond upon it, the right to use the water thus stored is exclusively in such owner; and the owners of land bordering on the artificial lake or pond do not acquire any right in the water upon the ground that the shores of the pond have been brought to their land. Akron Canal & Hydraulic Co. v. Fontaine, 72 Ohio App. 93, 50 N.E.2d 897; Goloskie v. La Lancette, 91 R.I. 317, 163 A.2d 325, cert. den. 364 U.S. 919, 81 S.Ct. 285, 5 L.Ed.2d 260.

Our conclusion that plaintiffs have no right to use the water stored over defendant's property when it involves a trespass answers their contention that the waters in Cibola Lake are public and therefore may be used without interference from the defendant.

■■ Moreover, it is also plain that the waters of Cibola Lake are nonnavigable in character. Taylor Fishing Club v. Hammett (Tex.Civ.App.), 88 S.W.2d 127. Even in states which recognize riparian rights, where the land under the water is owned by others, no riparian rights attach to the property bordering on the water, "and an attempt to exercise any such rights by invading the water is as much a trespass as if an unauthorized entry were made upon dry land of another." Miller v. Lutheran Conference and Camp Association, 331 Pa. 241, 247, 200 A. 646, 650, 130 A.L.R. 1245; and see Taylor Fishing Club v. Hammett, supra, and collation of cases 57 A.L.R.2d at p. 592.

"It may be conceded as a general proposition, as contended by appellee, that under the common law a riparian landowner whose land abuts on a nonnavigable lake and whose field notes call for the lake as a boundary line impliedly owns the land under the water to the center of the lake and that all riparian owners whose lands abut on such a lake have a right to the joint use of the entire lake for fishing and boating. [Citations] But regardless of what may be the rights of the abutting owners under such circumstances, we are of the opinion that such rule has no application to the facts here under consideration. Here the appellee, by specific grant from the state, owned the land under a definite and specific portion of the lake, and we think it a sound proposition that an abutting landowner whose field notes cross a nonnavigable lake and who, by virtue thereof, holds title to a specific portion of the bed of the lake, has a right to control that part of the surface of the lake above his land, including the right to fish in or boat upon the water, and that any use or interference therewith by

another constitutes an infringement on his rights as such owner. This is particularly true where, as in this case, the land lines are capable of being marked. [Citations]" Taylor Fishing Club v. Hammett, 88 S.W.2d 127, 130.

Plaintiffs seek to invoke the principle announced in Kroeger v. Twin Buttes R. R. Co., 13 Ariz. 348, 114 P. 553; 14 Ariz. 269, 127 P. 735, that one may not obstruct a running stream to the injury of adjacent lands. But this doctrine has no application here. The evidence is clear and convincing, supporting the trial court's finding of facts, that the defendant has not damaged the plaintiffs by reason of the construction and use of the turnout structure.

Plaintiffs, nevertheless, point to testimony to the effect that the defendant threatened to dry up the lake north of the dike. There is no finding of fact specifically rejecting this testimony. But such a finding is plainly implied from the judgment. Milam v. Milam, 101 Ariz. 323, 419 P.2d 502 (published this date).

Defendant denied that he threatened to dry up the northern part of the lake. Moreover, plaintiffs' evidence in this respect is inherently improbable. The entrance to the lake for water is through the turnout structure maintained by the defendant to the north. Since the water flows from north to south, it must pass the plaintiffs' property to reach defendant. Plaintiffs argue that pumps could be put in to maintain a water supply in the south end of the lake, but the defendant's testimony that he intended to place an opening in the proposed dike through which the water could reach his property and through which he could prevent its escape in times of low water is reasonable.

Finding no error, the opinions of the Court of Appeals are ordered vacated and the judgment of the Superior Court of Yuma County is ordered affirmed.

BERNSTEIN, V. C. J., and UDALL, LOCKWOOD and McFARLAND, JJ., concur.