464 P.2d 999

The STATE of Arizona, the State Land Department, a Department of the State of Arizona; Obed M. Lassen, State Land Commissioner of the State of Arizona, Appellants,

v.

BONELLI CATTLE COMPANY, a California corporation, Appellee.

No. I CA–CIV 734.

Court of Appeals of Arizona,
Division 1,

Department A.*

Feb. 16, 1970.
Rehearing Denied April 20, 1970.

Review Granted June 16, 1970.

Gary K. Nelson, Atty. Gen., by Dale R. Shumway, Special Asst. Atty. Gen., Phoenix, for appellants.

Elmer C. Coker, Phoenix, for appellee.

CAMERON, Judge.

This is an appeal by the defendant, State Land Department, from a judgment in favor of the plaintiff, Bonelli Cattle Company, which quieted titled to certain land situated along the Colorado River in Mohave County, Arizona.

We are called upon to answer the following questions:

1. Did the State of Arizona obtain title to the bed of the Colorado River when admitted to the Union by virtue of the "equal footing" doctrine?

2. Did the trial court err in not determining whether the river had moved by

---

* This matter was filed in the Arizona Supreme Court and transferred to this Court by order of the Supreme Court.

avulsion or accretion in making its decision?

3. When a navigable river is rechanneled by third parties and the former river bed is exposed by the removal of the water therefrom, who has title to the land thus exposed?

The matter was tried upon an agreed statement of facts which may be summarized as follows:

1. When originally surveyed in 1905–1906, the active flow channel of the Colorado River was entirely to the west of the subject land and did not in any way encroach upon said land. See Exhibit "B".

*Sec. 3 — 19N, 22W*
*Subject Land in Relation to*
*1906 River Channel*

*Subject Land —* ⬚⬚⬚
*1906 General Land Office Survey*

*Fig. 2. Exhibit B*

[A1223]

2. In 1910, the United States conveyed the subject land to the plaintiff's predecessor in interest, the Santa Fe Pacific Railroad Company and the plaintiff is the record owner in fee simple of the lands involved in the action.

3. Since the original survey and conveyance of the subject land, the Colorado River has moved eastward, and has in the past covered much, if not all of, the subject land; that immediately prior to 1959, the active flow channel of the river occupied most of the subject land. See Exhibit "E-1".

Sec. 3 – 19N, 22W
Subject Land in relation to 1959 River Channel before and after Channelization

Subject Land — ⬚⬚⬚
1960 Revision of Topography map by Office of River Control, Bur. of Recl.

[A1224]

Fig. 3. Exhibit E-1

4. In 1959, the Bureau of Reclamation rechanneled the Colorado River in the area of the subject land resulting in the active flow channel of the Colorado River being restricted to occupy only a portion of the subject land; that today part of the subject land lies outside of the artificially created active flow channel of the Colorado River on both the east and west sides of the channel. See Exhibit "G" below.

*Sec: 3 -19N, 22W*
*Subject Land in relation to*
*present (since 8-11-66) location*
*of Colorado River.*

*Subject Land —* ▨
*1962 Resurvey by Bur. of Land Management.*

[A1225]   *Fig. 4. Exhibit G.*

5. At statehood (14 February 1912) the boundary between Arizona and Nevada lay a considerable distance west of the subject land. By virtue of the Colorado River Boundary Compact, the boundary now lies down the center of the river as rechanneled by the Bureau of Reclamation in 1959.

After written briefs and oral arguments the trial court signed a judgment and decree in favor of the plaintiff, Bonelli Cattle Com-

pany, quieting title to the subject land. By "subject land" we mean the land in controversey to which the plaintiff is attempting to quiet title. In the judgment and decree the court found, *inter alia,* that the plaintiff had a proper "chain" of title to the subject land and:

"(3) That according to the aforesaid Official Plat of Survey approved and filed June 29, 1906, the Colorado River did not pass through any portion of the lands hereinafter described nor border thereon but since said time the Colorado River has moved eastward to various and different points and parcels of said land until its channel was stabilized in 1960 by rechannelization construction work conducted by the Department of the Interior through its Bureau of Reclamation where its stabilized man-made channel now crosses over the westerly portion of the lands hereinafter described and which man-made channel has been declared by Compact of the States of Nevada and Arizona approved by Congress June 16, 1961, Public Law 87-50, Eighty-seventh Congress, First Session (75 Stat. 93) to be the boundary between the States of Nevada and Arizona.

"(4) That the AGREED STATEMENT OF FACTS AND ISSUES do not establish the dates, degree and manner of movement of the Colorado River, but such issues are immaterial in determination of the rights of the parties in this action.

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that plaintiff BONELLI CATTLE COMPANY, a California corporation, is the owner in fee simple of and is entitled to the possession, use and enjoyment of the following described real property situate in Mohave County, State of Arizona * * *."

From this judgment defendant State Land Department appeals claiming title to the property between the property of plaintiff that remained after the eastward movement of the river as shown in Exhibit "G", supra, and the river as rechanneled.

## DOES THE STATE OF ARIZONA OWN THE RIVER BED BY VIRTUE OF THE "EQUAL FOOTING" DOCTRINE?

It is the contention of the State of Arizona that under the "equal footing" doctrine, upon admission to the Union, the State of Arizona obtained title to the bed of the Colorado River. With this we must agree.

The Colorado River as it flows through this section of its reach is a navigable river, Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154 (1931), and once determined to be navigable remains so. United States v. Appalachian Electric Power Co., 311 U.S. 377, 85 L.Ed. 43, 61 S.Ct. 291 (1940). See also Boulder Canyon Project Act, Ch. 42, 45 Stat. 1057 (1928), 43 U.S.C., Sec. 617 et seq. (1953).

In Pollard's Lessee v. Hagan, 44 U.S. (3 Howard) 212, 11 L.Ed. 565 (1845), the court held that the Constitution did not pass title of the beds of navigable waters to the United States, but reserved title to the several states. Because new states entered the Union on an *equal footing* with all the other states, title to the beds underlying navigable waters passes to the new states upon admission. Mumford v. Wardwell, 73 U.S. (6 Wall.) 423, 18 L.Ed. 756 (1867), Weber v. Board of Harbor Commissioners, 85 U.S. (18 Wall.) 57, 21 L.Ed. 798 (1873), Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1893), Martin, et al. v. Waddell, 41 U.S. (16 Peters') 367, 10 L.Ed. 997 (1842), Hardin v. Jordan, 140 U.S. 371, 35 L.Ed. 428, 11 S.Ct. 808 (1891), Kansas v. Colorado, 206 U.S. 46, 51 L.Ed. 956, 27 S.Ct. 655 (1906), Tyson v. State of Iowa, 8th Cir., 283 F.2d 802 (1960).

In addition, Congress recognized in Joint Res. No. 8, 21 August 1911, 37 U.S. Stat. 39, that Arizona was admitted on "equal footing" with the other states of the Union:

*"Joint Resolution To admit the Territories of New Mexico and Arizona as States into the Union upon an equal footing with the original States.*

*"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Territories of New Mexico and Arizona are hereby admitted into the Union *upon an equal footing* with the original States, in accordance with the terms of an Act entitled 'An Act to enable the people of New Mexico to form a constitution and State government and be admitted into the Union on an equal footing with the original States; and to enable the people of Arizona to form a constitution and State government and be admitted into the Union *on an equal footing* with the original States' commonly called the enabling Act approved June Twentieth, nineteen hundred and ten, and upon the terms and conditions hereinafter set forth. \* \* \*" (emphasis ours)

The Arizona Supreme Court has recently stated in construing the title to the bed of the Colorado River:

"We therefore hold that the State of Arizona holds *title* and *control* over the submerged lands and navigable waters where the accident occurred." Morgan v. Colorado River Indian Tribe, 103 Ariz. 425, 427, 443 P.2d 421, 423 (1968).

See also Cherokee Nation or Tribe of Indians in Oklahoma v. Oklahoma, 10 Cir., 402 F.2d 739 (1968).

▇ We therefore hold that under the "equal footing" doctrine the State of Arizona obtained title to the river bed of the Colorado River as it existed in 1912 and at the location of the river in the instant case.

WAS THE TRIAL COURT REQUIRED
TO FIND WHETHER THE RIVER
MOVED BY ACCRETION OR
AVULSION?

▇ The only conclusion that can be drawn from the agreed statement of facts and the attached maps and photographs in evidence is that sometime between the making of the original survey in 1905 and 1906 and 24 April 1938, the channel of the Colorado River moved in an undetermined manner to a position where the bed of the river ran over and occupied most of the subject land to which the plaintiff claims title. We are not in a position to determine from the record whether this change was accretive or avulsive nor do we believe the record was sufficient to enable the trial court to so determine.

It is contended by the appellant, State of Arizona, that before the trial court could determine the matter it was required to make a finding of fact whether the river had moved to and over plaintiff's land by accretion or avulsion. Appellant points out the general rule that where a change occurs in the location of the river through a process of erosion or accretion which is a natural and gradual movement of the river, the State would gain title to the bed of the river as it slowly moved losing title to the land that the river has abandoned. The owners of the bank would also lose or gain as the case may be during this slow, imperceptible process. We agree that this is the generally accepted law in regard to accretion in Arizona. Arizona v. Gunther & Shirley Company, 5 Ariz.App. 77, 83, 423 P.2d 352 (1967) (review denied 21 March 1967), State v. Jacobs, 93 Ariz. 336, 380 P.2d 998 (1963).

The State admits that as to avulsive changes neither the State as owner of the river bed nor the parties riparian thereto lose or gain any interest or title to the land as changed. The general law in this regard is summarized in 65 C.J.S. Navigable Waters § 86(b) (1966):

"Ordinarily an avulsion does not divest the title to lands covered, or uncovered, or shifted by the action of the stream, provided the former boundary can be determined or the land reclaimed within a reasonable time; nor does it confer title to lands uncovered by the water. If the land afterward reappears, the riparian owner retains his title thereto, provided the identity of the land can be established, although it has been held that, where land is obliterated by an avulsion, the owner loses title thereto. Further, a riparian owner may reclaim

lands submerged by an avulsion either by natural or by artificial means. It has been held that, in applying the law of avulsion, it is immaterial whether a stream is navigable or nonnavigable, since the same principles apply to each."

There is admittedly a minority view in this regard which holds that as to a navigable river the State acquires the title to the new bed, loses title to the old bed, with the abutting landowners acquiring title to the old bed. Manry v. Robinson, 122 Tex. 213, 56 S.W.2d 438 (1932), Seabrook Land Company v. Lipscomb (Tex.Civ. App.), 331 S.W.2d 429 (1960), Maufrais v. State, 142 Tex. 559, 180 S.W.2d 144 (1944). This follows logically the view that the bed of a navigable river should be in the State in order to avoid any interference in the exercise of the State's sovereignty over the river:

> "The doctrine is well established that one of the incidents of sovereignty is control of navigable waters and ownership of land thereunder." 3 American Law of Property, § 12.27b (A. J. Casner ed. 1952)

But even if we were to adopt the majority view, we do not believe that the trial court was required to make a determination of the matter of movement for the reason that where the facts are insufficient to establish the manner in which a navigable river has moved there is a presumption that such movement was by accretion rather than by avulsion. Nebraska v. Iowa, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186 (1892), County of St. Clair v. Lovingston, 90 U.S. (23 Wall.) 46, 23 L.Ed. 59 (1874), Kitteridge v. Ritter, 172 Iowa 55, 151 N.W. 1097 (1915). This presumption is based in logic in that an avulsive change is usually an event of such magnitude that it is normally noted, if not by the riparian landowner, at least by persons in the vicinity and testimony is therefore easy to obtain as to the fact of the avulsive change. The fact that no evidence is available to indicate the manner of movement is in itself an indication that the movement was slow and imperceptible and therefore accretive rather than avulsive.

We therefore hold that there being a presumption that the movement was accretive there is a presumption that the State of Arizona owned the bed of the river as it had moved to and upon plaintiff's property.

## WHAT WERE THE RIGHTS OF THE PARTIES WHEN THE RIVER WAS RECHANNELED?

The plaintiff was the owner of the land bordering the river before the river was rechanneled and was the riparian owner. Turner Subdivision Property Owners Ass'n v. Schneider, 4 Mich.App. 388, 144 N.W.2d 848 (1966). The question before the Court is whether the State can claim title to the area between the river and petitioner's land after rechanneling. The law is well settled that in determining this question state law applies. Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894).

Although Arizona rejects absolutely the riparian doctrine as to use of water, Brasher v. Gibson, 101 Ariz. 326, 419 P.2d 505 (1966), riparian rights are recognized as far as land title is concerned, State of Arizona v. Gunther & Shirley Company, supra. One of the rights of a riparian landowner is access to the water, and to allow the state to retain title to the intervening property would allow the State to terminate this very valuable right. Colberg, Inc. v. State, 67 Cal.2d 408, 62 Cal.Rptr. 401, 432 P.2d 3 (1967). Two theories have been advanced to cover this situation. The first is called the "artificial accretion" doctrine. It has been stated:

> "* * * [T]here are authorities broadly according an upland owner the right to accretions resulting from artificial causes, or holding that the riparian owner is entitled to accretions when caused or aided by artificial conditions created by third persons in which he has no part." 65 C.J.S., Navigable Waters, § 82(2) (1966).

And:

"* * * The court divided accretion or accession into three classes: (a) Accession made either by a retreating of the river or by the insensible addition of alluvion; (b) Accession made by the 'instantaneous casting up of the bed of the stream' above the water-level and against the upland, and (c) Accretions to the upland made by a stranger 'without the authority of government,' 'immediately contiguous to the upland so as to exclude the water from contact with the upland, and thus (unless these accretions belong to the upland) deprive the owner of the upland of the opportunity to have the alluvial accretions. Accessions under group (a) would be the property of the upland owner. Accessions under group (b) would be the property of the owner of the bed of the stream, here the State of Alabama. Accessions under group (c) would inure to the benefit of the riparian owner. * * *" State v. Gill, 259 Ala. 177, 180, 66 S.2d 141, 142 (1953). See also Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236 (1957).

The doctrine of re-emergence has also been urged in cases of this kind:

"As an alternative theory of recovery, appellants raised a title claim under the doctrine of re-emergence. That doctrine rests upon 'easy identification' of riparian land 'lost' and 'found' again by re-emergence from the stream bed. These elements are not here present.

"We agree with the government:

'* * * In order for the doctrine to be applied in those states that recognize it, two things must occur: First, the water-course must move across and submerge riparian land so that land formerly non-riparian is made riparian; then the water-course must return to or near its original bed so that the riparian land that had been submerged is uncovered, or re-emerges.

* * * * * *

'The United States' land to which the tract has accreted was riparian originally and one of the reasons for the doctrine of accretion is to allow that land to remain riparian. Philadelphia Co. v. Stimson, 223 U.S. 605, 624, 32 S.Ct. 340, 56 L.Ed. 570 (1912). * * *'."

Beaver v. United States, 9 Cir., 350 F. 2d 4, 11 (1965).

If the removal of the water from the land was by the process of reliction, which is gradual and analogous to accretion, the theory of artificial accretion would apply. If the water was suddenly removed by a man-made avulsion then the doctrine of re-emergence would apply. In either event we feel that the State may not take advantage of this man-made rechanneling to extinguish plaintiff's riparian land rights along this navigable river and deny plaintiff title to the land previously owned.

Nothing we say herein should be construed to affect title to land west of the boundary in the State of Nevada or land along non-navigable streams.

Judgment affirmed.

DONOFRIO, P. J., and STEVENS, J., concur.