**Blanche W. PETERSON and Flay O. Peterson, Plaintiffs,**

v.

**Rogers C. MORTON, the Secretary of the Interior of the United States of America, the United States of America, and the State of Nevada, Defendants.**

**Civ. No. LV–1926.**

United States District Court, D. Nevada.

Jan. 31, 1979.

---

1. Government's Exhibit D.

Edward G. Marshall, Las Vegas, Nev., for plaintiffs.

B. Mahlon Brown, U. S. Atty., Las Vegas, Nev., John E. Lindskold, Dept. of Justice, Washington, D. C., for the U. S.

Robert F. List, Atty. Gen., State of Nev., Carson City, Nev., Thomas G. Nelson, Sp. Asst. Atty. Gen., Twin Falls, Idaho, for State of Nev.

## OPINION

ROGER D. FOLEY, Chief Judge.

### INTRODUCTION

It is plaintiffs' claim that their predecessors in interest owned land on the east side of the Colorado River in Arizona, including a parcel of approximately 310 acres. Over time, the Colorado River moved easterly across this parcel and now most of the parcel has emerged from the river and is

situated in Nevada, the western side of the river. Plaintiffs ask this Court to quiet title in them to that part of the 310 acres, a parcel of approximately 259 acres referred to herein as the "subject parcel," that has emerged on the Nevada side of the river. Plaintiffs assert jurisdiction in this court to quiet title in them under Title 28, U.S.C., § 2409a.

Defendants claim that plaintiffs' land was entirely eroded away in the physical sense by the easterly movement of the river and has disappeared. It is gone. It exists no more. Plaintiffs' soil was washed away grain by grain, particle by particle. It was carried off by the river and deposited on other lands downstream adding to such other lands, that is, it accreted to such other downstream lands. True, defendants concede, the geographical position on the earth's surface where the plaintiffs' land had been situated, still exists but, as the river moved easterly, eroding away the plaintiffs' land, this geographical position became submerged in the river and for many years was actually under water in the bed of the river. True, this geographical position where plaintiffs' 310-acre parcel had been located has now nearly all emerged from the river as dry land on the Nevada side of the river, but this is not plaintiffs' property; it is just the geographical position where plaintiffs' property once was. This land that has emerged on the Nevada side of the river, the subject parcel of 259 acres, was created by accretion of soil eroded away upstream by the river. The defendant United States, as the owner of the riparian uplands, claims title to the subject parcel. The defendant State of Nevada claims title to a portion of the subject parcel.

## PLAINTIFFS' CASE IN CHIEF

The subject parcel was a part of a large parcel of public lands patented by the United States to the Santa Fe Railroad Company in 1910. Plaintiffs offered into evidence the said patent and further documentary proof of title in them by mesne conveyances from the Santa Fe Railroad Company and rested their case in chief.[1]

## DEFENDANTS' CASE

The defendants do not dispute plaintiffs' evidence of title by mesne conveyances from the Santa Fe Railroad, the patentee of the United States. However, defendants offered proof tending to show:

1. That the Colorado River, in historic times, i. e., since approximately 1850, has moved slowly and imperceptibly eastward, eventually eroding away the plaintiffs' property;

2. That between approximately 1915 and 1934, the geographic position on the earth's surface where plaintiffs' property had been situated, was physically submerged under the water of the river;

3. That thereafter most of the geographic position on the earth's surface where the eroded-away property had been situated, emerged from the water on the westerly, the Nevada, side of the river;

1. The patent to the Santa Fe Railroad from the United States was granted November 5, 1910. Plaintiffs, by mesne conveyances from the Santa Fe Railroad, took title October 9, 1958, to Lots 2, 3, 4, 5 and 6, and S ½ of NW ¼ and NE ¼ of SW ¼ of Section 3, T 19 N, R 22 W, Gila & Salt River Meridian, 310 acres more or less. See plaintiffs' Exhibits 1 to 13, inclusive. The subject parcel of approximately 259 acres is described by metes and bounds in Exhibit 13 and is platted on Exhibit 26, which is the result of a survey by B. E. Coffman, completed on May 9, 1971, in which the subject parcel is described as being found in parts of Sections 15 and 22, T 33 S, R 66 E, MDB&M, as well as a part of Section 3, T 19 N, R 22 W, G&SRM. (Coffman describes the property conveyed to plaintiffs in 1958 according to both the Mount Diablo Base Meridian and Gila and Salt River Base Meridian. As noted on Exhibits L, M–1 and M–2, the property on the eastern side of the Colorado River in Arizona is tied to the Gila and Salt River Base Meridian, whereas property on the west, or Nevada, side of the river is tied to the Mount Diablo Base Meridian.) The subject parcel of 259 acres, now dry land on the western side of the Colorado River, is depicted in red on Exhibit A, Transparency No. 12. On Exhibit 33, William S. Gookin, plaintiffs' expert witness, marked as red "X's" the approximate section corners of Section 3, T 19 N, R 22 W, G&SRM, and drew in red the subject parcel. See also plaintiffs' drawings, pages 23 and 36 of plaintiffs' trial brief.

4. That in 1960 when the permanent channelization of the Colorado River, in the area of concern, was completed, nearly all of the geographic position in the shape of what had been plaintiffs' property was now dry land on the western, or Nevada, side of the river;

5. That this dry land, the subject parcel of 259 acres, in the same geographic position where plaintiffs' land had been, was new land formed by accretion from soil transported by the river, either eroded away from upstream riparian lands or picked up upstream from the river bed itself;

6. The defendant United States claims title to the subject parcel in its proprietary capacity only. The defendant United States as owner of the riparian uplands, i. e., the public domain in Nevada, claims title to the subject parcel contending that the subject parcel had accreted to the riparian uplands owned by the United States. The State of Nevada initially claimed only an executory interest in the subject parcel by virtue of a contract between the United States and Nevada whereby the United States agreed to sell certain public lands to Nevada, including the subject parcel. At the close of the trial, however, the State of Nevada claimed, in addition to its rights under the executory contract with the United States, title to that part of the subject parcel that lies between the western bank of the permanently channelized river and the modern westerly ordinary high water mark of the river.

## PLAINTIFFS' CASE IN REBUTTAL

Although plaintiffs concede the physical facts that their land was once located east of the Colorado River in Arizona, and that the subject parcel, title to which plaintiffs claim, is now situated west of the Colorado River in Nevada, plaintiffs resist defendants' claim that plaintiffs' land eroded away and that the subject parcel is not plaintiffs' land but new land formed by accretion from soil transported by the river, eroded away upstream. Plaintiffs offered evidence that the Colorado River generally, and in the area of the subject parcel, was subject to frequent avulsions.[2] Plaintiffs contend that the evidence shows that the eastward movement of the river inundating and passing over plaintiffs' property was by frequent avulsions, as well as the result of some erosion. Plaintiffs argue that since they have established legal title, defendants have the burden of proof that plaintiffs lost title by erosion, which burden plaintiffs say defendants have not met. Plaintiffs further argue that in view of plaintiffs' proof of avulsion, together with defendants' failure to prove loss of plaintiffs' title by erosion, this Court should decree that the subject parcel is in fact 259 acres of the 310 acres that the plaintiffs acquired by purchase and is owned by plaintiffs.[3]

2. *Avulsion.* The expert witnesses testified that avulsion occurs when the river abandons its bed and assumes a new bed, leaving portions of land in between intact in which the individual grains of sand remain the same. They have not been eroded or washed away but the river has in fact jumped across them.

3. There is precedent in this circuit for the positions taken by the parties in this litigation. *Beaver v. United States,* 350 F.2d 4 (9th Cir. 1965), decided a somewhat similar case in favor of the United States. At pages 6 and 7, the Court stated:

"A brief statement of the physical situation will aid in understanding the various contentions. The Colorado River (hereafter, the river), the boundary between Arizona and California, runs generally east to west along the southern boundary of the tract in question . . . . . The tract in question is in the same physical location as land patented to appellants' predecessor in title in 1914, and, at that time, located in Arizona. Prior to 1902, the river in this area flowed in a channel located several thousand feet north of its present location and along the southern boundary of Section 4. Between 1902 and 1942 the river channel moved in a southerly direction until it established the channel approximately in its present location.

"It is the contention of the United States that the river channel arrived at its present location by a slow accretive movement, eroding the southern (Arizona) bank of the channel and depositing soil on the northern (California) bank. In this manner the land claimed by appellants was washed away and the tract in question was added by accretion to Section 4, owned by the United States; under well-settled principles the tract thus belongs to the United States. Appellants, on

## STATUTE OF LIMITATIONS

The defendant United States claims that the twelve-year statute of limitations within which an action under 28 U.S.C. § 2409a may be brought (28 U.S.C. § 2409a(f)) began to run on April 22, 1960, and hence plaintiffs' claim is barred because the original complaint herein was not filed until October 25, 1972. It is the theory of the United States that P.L. 86–433, 74 Stat. 74, approved April 22, 1960, gave plaintiffs notice of the adverse claim of the United States to the subject parcel. The Government argues that from P.L. 86–433 the plaintiffs knew, or should have known, of the federal claim to the subject parcel. This Court finds to the contrary. P.L. 86–433 authorized the United States to convey certain public lands, situated in Nevada, to the State of Nevada. It is not clear at all that P.L. 86–433 described the subject parcel but, assuming that it does, Section 5 of the Act provides that:

"Any conveyance authorized by this Act shall be made subject to any existing valid rights pertaining to the lands included within the transfer area."

the other hand, contend that the river arrived in its present location by several avulsive movements and for this reason the state boundary and the property line boundaries in the area were permanently fixed at the site of the 1902–1912 channel. Therefore, appellants say, the tract is still located in Arizona and appellants' land was not lost by erosion."

"In summary, the district court held that the property in dispute had been created on the California side of the river by the gradual process of erosion and accretion.

". . . the district court found the land in question had accreted to government-owned land in California, and its title had thus been acquired by the United States Government."

at pages 10, 11 and 12:

"We next examine the question of whether the land involved is accreted land . . .

"The determination of whether land is accretive depends, by Supreme Court definition, upon whether the shift of the land in question, when it has taken place, has been 'gradual and imperceptible'; or 'sudden and perceptible'. *Philadelphia Co. v. Stimson,* 223 U.S. 605, 624, 32 S.Ct. 340, 56 L.Ed. 570 (1912).

"Here, the United States presented detailed testimony and well-documented exhibits on the course of the river in the vicinity of the tract in question from 1902 to 1942. That evidence showed a small bend developing a short distance above the government-owned Section 4 between 1902 and 1912. The bend migrated in the classic manner, eating away soil on the concave bank and depositing soil on the convex bank. In this manner, the bend moved downstream eroding the Arizona bank and building up the California bank. Between 1922 and 1925, the bend reached the site of the land in Arizona that is now claimed by appellants. By 1925, about half of the land had washed away and by 1926 the land had been entirely taken and the bend was continuing its downstream progression. The United States land opposite this area was slowly being built up by the soils washed downstream so that between 1930 and 1936 the accretion was complete and the tract in question here was formed. Since 1936 the river has remained in relatively the same location as it flows past the tract. . . .

"Appellants claimed there was an avulsive change. The government contended that if any avulsive change had occurred, it had taken place at another location on the river. The trial court held that the weight of the evidence supported the government's position. It expressly found accretion, not avulsion, at the site of the disputed property.

". . .

". . .

"The United States' land to which the tract has accreted was riparian originally and one of the reasons for the doctrine of accretion is to allow that land to remain riparian. *Philadelphia Co. v. Stimson,* 223 U.S. 605, 624, [32 S.Ct. 340, 56 L.Ed. 570] . . .

"*Stone v. McFarlin,* 249 F.2d 54, 55–57 (C.A.10, 1957), cert. den., 355 U.S. 955, 78 S.Ct. 540, 2 L.Ed.2d 531 * * * *Anderson-Tully Co. v. Tingle,* 166 F.2d 224 (C.A.5, 1948), cert. den., 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371, where the court stated (pp. 228–229): 'Where a river is a boundary and there is no avulsion, a land-owner can never cross the river to claim an accretion on the other side.' (Appellee's Brief, pp. 15–17.)

". . .

". . . Appellants equate the precise land lost by erosion from the land on the Arizona side of the river with the precise land gained by accretion on the California side. There is no 'physical identity' between the two areas of land, even though each is described as within the same Section 4, of Township 9 South, Range 22 East, San Bernardino Meridian. Accreted land comes from anywhere in the river above the accretion, grain by grain, and so gradually that tracing its source is theoretically impossible. If directly traceable, it more usually is evident that what occurred was the result of an avulsion process."

Therefore, this Court finds that it was not until October 26, 1966, when there was recorded in Clark County, Nevada, a contract authorized by P.L. 86–433 between the United States and the State of Nevada wherein the Government agreed to sell to the State certain lands, including the subject parcel, that plaintiffs had notice of the adverse claim of the United States.

## GEOGRAPHY

The subject parcel is located in Mojave Valley. Mojave Valley is approximately 30 miles long. The subject parcel is approximately 4½ miles north of the point where the Nevada-California state line intersects the 35th degree of latitude. The subject parcel is about 13 miles south of Davis Dam. Davis Dam is approximately 60 miles south of Hoover Dam. Davis Dam is about 70 miles north of Parker Dam.

The area of concern in this litigation is an approximate 4-mile stretch of the Colorado River through Mojave Valley just south of Big Bend, between the chalk cliffs on the Nevada side and Mojave Point on the Arizona side. The chalk cliffs restrict the flow of the river, preventing if from flowing farther west after it flows southwesterly around Big Bend to the chalk cliffs. Mojave Point is a large circular-appearing protrusion of a mesa rising more than 50 feet above the valley floor. Mojave Point restricts the easterly flow of the river, forcing the river to flow around it to the west before it can flow farther south and downstream. See Exhibits L and 33.

4. Hoover Dam was closed, and Lake Mead began to form, in 1935. Parker Dam was closed, and Lake Havasu began to form, in 1938. Davis Dam was closed, and Lake Mojave began to form, in 1950.

5. The permanent channelization of the lower Colorado River, in the area of concern, by the United States Bureau of Reclamation was accomplished in 1959 and 1960, confining the river to a narrower width. In Mojave Valley, there are 32 miles of a new artificial narrower channel, varying from 400 to 500 feet in width. (See maps, Exhibit N, depicting the river before permanent channelization, and O, after permanent channelization. See also Exhibits M–1 and M–2 depicting both the permanently chan-

## EXPERT WITNESSES

Plaintiffs and defendants produced two highly qualified expert witnesses, Mr. John S. McEwan for the defendants, and Mr. William S. Gookin for the plaintiffs.

Reading through the transcript of testimony for the first time might cause one to believe that there is considerable conflict between the testimony of the two experts. However, after careful study, this Court finds that the areas of disagreement are narrow and, although in those areas the experts strongly differ, McEwan and Gookin are, generally speaking, in agreement. Their expertise and the integrity each demonstrated during examination make both of them most credible witnesses. Each of them have contributed much assistance to the Court.

## HISTORY

According to the expert testimony, the area of concern in this litigation and Mojave Valley as a whole, was once a part of the Gulf of California, then a lake, and later, but still in ancient times, one thousand years ago or more, a prehistoric river. The history of the modern river in the area of concern begins about the year 1850, and the evidence in this case deals with river conditions since about 1850. The evidence establishes that the lower Colorado River before it had been harnessed by dams,[4] and was permanently channelized,[5] regularly overflowed its banks in the spring and early summer and fanned out across the valley

nelized river and the old left (east) and right (west) banks of the river.)

In P.L. 87–50, adopted June 16, 1961, 75 Stats. 93, Congress approved the interstate compact between Arizona and Nevada establishing the state boundary between Arizona and Nevada on the Colorado River. (Arizona approved the compact on March 24, 1960. Nevada approved the compact on March 9, 1960.) In the area of concern, the state boundary between Arizona and Nevada is the center line of the permanently channelized river. In addition, the Court notes that the Constitutions of both Arizona and Nevada recognize the center line of the Colorado River as the state boundary.

floor towards and often up to the modern bluff lines.[6] As the flooding subsided in the late summer and fall, the river would recede and most likely cut for itself a new narrower channel or channels in the valley floor nearly always different from the channel or channels in which it had flowed in the same season of the previous years. In addition to the annual periods or seasons of flooding, subsidence, and sustained periods of low flow, the evidence establishes that there were high flow years and low flow years that further contributed to the erratic and turbulent behavior of the river. The range of flow before the closure of Hoover Dam in 1935 was tremendous, varying in a few months from over 100,000 cubic feet per second to less than 5,000 cubic feet per second. The evidence is that the period from about 1885 to 1905 were low flow years, and the period from about 1905 to 1929 were high flow years. Between 1905 and 1915, there were four major floods. In addition to the plentiful testimony on the characteristics of the river, indicative of the erratic and turbulent behavior of the river and the unpredictability of just where its channel or channels would be in any given season or any year in the valley floor within its modern bluff lines, are the eleven transparencies of Exhibit A and their underlying supporting exhibits, B, C, D, E, F, G–1 and G–2, H, I, J–1 and J–2, K, L, M–1 and M–2, N and O, as well as 18A and 18B, 19, 20, 21B and 21C, 22, 23, 24, 40A, 42 and 57, and the flow charts in evidence, Exhibits 34A and R.

In the historic period between 1850 to 1960 when permanent channelization in Mojave Valley was completed, the Colorado River did not overflow its modern bluff lines but did continuously cut new channels for itself season to season, year to year, within the valley floor and within the modern bluff lines.

According to the expert testimony, in its natural state the lower Colorado River was a muddy river, transporting approximately sixteen million tons of silt downstream annually. With the closure of Hoover Dam in 1935, Lake Mead was formed and the silt that the river had in suspension[7] when it was in its natural muddy state settled out and the water in Lake Mead behind Hoover Dam became clear. The ability of water to carry silt in suspension up to its saturation point depends on its velocity and on other factors such as the slope of the river and its configuration. With the creation of Lake Mead behind Hoover Dam, the speed of the flow of the river lessened as the river approached and reached Lake Mead and, as velocity lessened, silt in suspension settled to the bottom and the water in the lake became clear. This process where silt in suspension settled out as the velocity of the water decreases, depositing sediment and raising the elevation of the river bed, is called *aggradation*. The river bed is aggraded. Conversely, when clear water was released from Hoover Dam, it had the capacity to take into suspension approximately the same quantities of silt that it had carried formerly, given the same velocity and the existence of other pertinent factors, and did so quickly by picking up sediment from the river bed and taking it into suspension until its saturation point was reached. Thus, the clear water released from Hoover Dam quickly picked up and took into suspension substantial quantities of sediment from the river bed, thus lowering the elevation of the river bed, or degrading the same. This process is called *degradation*. Before Davis Dam was closed in 1950, the river transported much of the

6. The modern bluff lines are clearly delineated by W. P. Rowe & Son's maps, the Exhibits 40A, 1–20 incl., a part of the Rowe report, Exhibit 40 in evidence. The modern bluff lines were described by both experts and McEwan did, on cross-examination by plaintiffs' counsel, outline on Exhibit 33 in green, portions of the modern bluff lines on both the west (Nevada) and east (Arizona) sides of the river.

7. Although this Court speaks only of "silt" in suspension and the deposition of "sediment," it is acknowledged that in periods of high flow, and particularly during flood stages, the waters, in addition to carrying silt in suspension, wash along heavier particles of soil that are not in suspension. Also, of course, before the silt in suspension settles out, the heavier particles of soil drop out.

silt that it had picked up below Hoover Dam into Mojave Valley. After the closure of Davis Dam in 1950 and the creation of Lake Mojave behind it, the silt picked up below Hoover Dam settled out in the headwaters of Lake Mojave and in Lake Mojave itself. Similarly, when clear water was released from Davis Dam, it quickly degraded the river bed and the sediment that it picked up and took into suspension was carried from below Davis Dam into the Mojave Valley.

Parker Dam, although below Mojave Valley, did have an effect upon the area of concern after Parker was closed in 1938. Lake Havasu was created by Parker Dam. As the velocity of the water flowing into Lake Havasu lessened, the silt being carried settled out in the headwaters of and in Lake Havasu itself. Mojave Valley is in the headwaters of Lake Havasu.

Mojave Valley is wide, nearly flat, sandy, much in the fashion of a river delta, as the result of the regular disposition of sediment that had been picked up upstream. Although the harnessing of the Colorado River by dams substantially decreased the quantity of silt picked up upstream and deposited downstream, and although the 1960 permanent channelization reduced it much more, the river continues to aggrade and degrade by picking up silt upstream and depositing it downstream.

## ESSENTIAL FINDINGS

The experts have used interchangeably the phrases "mean high water mark" and "ordinary high water mark." Sometimes the phrase "high water line," rather than "high water mark," was used. The Court has chosen to use the phrase "ordinary high water mark."

There is disagreement between the experts as to the definition of "ordinary high water mark" and sharp disagreement as to the position in the area of concern of the modern westerly ordinary high water mark and the modern easterly ordinary high water mark.

As to definitions, McEwan says simply that the ordinary high water mark is a cut

mark or escarpment on the ground that a surveyor can find, made over time by the river during periods of ordinary high flow, a mark made by action of the river so frequently as to erase vegetation. It is the outer edge of the bed of the river, the river banks. Gookin defines the ordinary high water mark as that mark on the ground or escarpment found at the margin of the area occupied by the water for the greater portion of the average year. Gookin discounts utilizing the swept-clear-of-vegetation test.

This Court sees no justification for the test that the area between ordinary high water marks be occupied by water for the greater part of the average year. This would be quite difficult, if not impossible, for surveyors to determine. Therefore, the Court adopts McEwan's test as the one in general use, that is both reasonable and practical.

Despite Gookin's testimony to the contrary, this Court is persuaded by the defendants' evidence as to the location of the modern westerly and easterly ordinary high water marks. The Court finds that the ordinary high water marks were, in 1938, as outlined in red by McEwan on Exhibits J–1 and J–2, and as depicted on Transparency No. 8 to Exhibit A.

The Court further finds that Exhibit M–1, Bureau of Land Management Resurvey, dated 5/17/62, of T 33 S, R 66 E, MDB&M, and Exhibit M–2, BLM's Resurvey, dated 10/12/62, T 19 N, R 22 W, G&SRM, accurately depict the westerly ordinary high water mark and the easterly ordinary high water mark before permanent channelization in 1960, the westerly ordinary high water mark being described in M–1 as "OLD RIGHT BANK OF COLORADO RIVER," and the easterly ordinary high water mark being described on M–2 as the "OLD LEFT BANK OF COLORADO RIVER." The same ordinary high water marks are accurately depicted on Transparency No. 11 of Exhibit A. It can be noted that when Transparency No. 12 is laid over Transparency No. 11, the modern westerly ordinary high water mark cuts across the

subject parcel running southerly from the northeast to the southwest. There is no evidence from which the Court can find the precise locations of ordinary high water marks in the area of concern in earlier years, although there was some expert opinion given on the subject.

The Court finds from the testimony of both experts that the river below the chalk cliffs and above Mojave Point from time to time during the historic period, meandered back and forth across the valley floor, but always within its modern bluff lines. Sometimes, in periods of high flow, the entire valley floor was covered with water. Sometimes, in periods of low flow, only a portion of the valley floor was covered with water and the river flowed in a narrow channel. In addition, the river was often braided, flowing in more than one channel within the valley floor. These braided channels diverged and converged, they split apart and crossed over each other. Often, too, except in periods of high flow, sandbars appeared above the water level in a channel or between channels.

In low flow periods, the river dropped almost due south from the chalk cliffs, passing some distance to the west of Mojave Point. In the same area, in high flow periods, the river was quite sinuous, flowing in serpentine fashion with large loops, as testified to by both experts and as diagrammed by McEwan on Exhibit T and by Gookin's Exhibit 60. The river meandered outwardly and downstream, that is, easterly and southerly. On the concave or outside (eastern side) of the loop, water flowed faster than on the convex or inside (western side) of the loop, both because of centrifugal force and because the water on the outside had farther to go. The faster flowing water on the outside (eastern side) of the loop eroded away some soil from the eastern bank, degrading the river bed along the outside (eastern side) of the loop. The slower flowing water, slower because it had a shorter distance to traverse on the inside (western side) of the loop aggraded the river bed, depositing some sediment, thus building up the western bank by accretion.

As the river flows southwesterly around Big Bend, it is restricted by the chalk cliffs. On the Nevada side of the river, the chalk cliffs prevent the river from flowing farther west. As the river flows southerly from the chalk cliffs, it can fan out across the valley floor. It can meander southeasterly for about four miles and then it again becomes restricted, this time by Mojave Point on the Arizona side of the river. When the river meanders southeasterly to Mojave Point, Mojave Point binds the river into a position where it cannot move farther southeasterly, Mojave Point forces the river around it to the west. The river must flow laterally across the valley to the west before the river can proceed farther south and downstream in Mojave Valley.

Although there is some disagreement by Gookin, the Court finds credible the description by McEwan of the modern bluff lines of the Colorado River between the chalk cliffs and Mojave Point, designated by McEwan by green lines on Exhibit 33. The Court finds that these modern bluff lines are approximately one and one-half miles apart across the northern boundary line of the subject parcel, and approximately two miles apart across the southerly boundary line of the subject parcel.

On Exhibit S, McEwan diagrammed and assigned labels to the cross section of the river before permanent channelization and with minor exception Gookin agrees. The description in words is difficult, but essentially it is as follows: Let us assume that the water level of the river is at the low water mark, that is, the lowest stage to which it normally recedes under ordinary conditions. If one walks easterly, that is, riverward, from the westerly modern bluff line, he will walk across the westerly modern flood plain until he reaches the modern westerly ordinary high water mark; one would then continue to walk easterly and riverward from the modern westerly ordinary high water mark across the shore to the low water mark or water's edge; one would then wade across the river, if not too deep, to the low water mark, or river's edge, on the east side; then, continuing to

walk easterly, one would cross the eastern shore to the modern easterly ordinary high water mark; continuing to walk easterly, one would proceed across the easterly modern flood plain to the easterly modern bluff line.

It is clear from the evidence that between about 1905 and 1934 the river below the chalk cliffs and above Mojave Point meandered easterly and southerly across the valley floor and flowed over and across the geographical position of plaintiffs' land. Between 1915 and 1934, the geographical position of plaintiffs' land was in the river bed. After 1934, the subject parcel began to emerge on the west side of the river. After permanent channelization in 1960, the entire subject parcel had emerged on the west side of the river.

Although there is sharp disagreement between the experts, the Court is persuaded, by a preponderance of the evidence, that the geographical position of plaintiffs' land was probably completely inundated and submerged in the bed of the river from approximately 1915 to approximately 1934 but, if not completely under water at all times during those years, it was certainly within the modern easterly and westerly ordinary high water marks of the river and therefore within the bed of the river. Hence, at least by 1915 all of plaintiffs' land had been completely eroded away.

Undoubtedly there was erosion of the series of successive eastern banks as the river meandered easterly. However, the Court finds that the easterly movement of the river was also caused by flooding, in the high flow period of 1905 to 1929, when the river overflowed its eastern banks and inundated the Arizona land, including the geographic position of plaintiffs' land. Thus, plaintiffs' land was not only eroded away as the river moved easterly, but also it was covered by flood waters and became a part of the river bed. When the flood waters subsided and the water flowed back, returning to a narrower bed, the overflowed eastern banks, being saturated with water, sloughed off and eroded away rapidly with the return flow.

The permanent channelization of the river had no effect insofar as plaintiffs' claim to title to the subject parcel is concerned. Plaintiffs' land had all eroded away well before permanent channelization.

The Court finds that before permanent channelization that part of the subject parcel west of the modern westerly ordinary high water mark had accreted to the owner of the riparian uplands, the public domain of the United States in the State of Nevada. Such part of the subject parcel was new land that had been formed by accretion. It was composed of new particles of soil, new grains of sand that had been deposited by the river. These new particles of soil and grains of sand had been eroded away upstream and from riparian land or the river bed itself. As depicted on Exhibit M–1 as "OLD RIGHT BANK OF COLORADO RIVER," the modern westerly ordinary high water mark cuts across the subject parcel running southerly from the northeast to the southwest and the State of Nevada claims title to that portion of the subject parcel between the modern westerly ordinary high water mark, as depicted on Exhibit M–1 as "OLD RIGHT BANK OF COLORADO RIVER," and the west bank of the permanently channelized river.

This Court is persuaded, by a preponderance of the evidence, and finds that there were no avulsions of any significance between the chalk cliffs and Mojave Point between 1905 and 1934. This Court excludes as not significant any and all avulsive movements of the river that may have occurred within the river's modern ordinary high water marks, that is, within the bed of the river itself. This Court further finds from the evidence that there were no avulsive movements outside of the modern ordinary high water marks in the area of concern. There is absolutely no evidence before this Court that there is on the ground evidence of past avulsions (like Exhibits U, V, and W, for instance), either inside or outside of the modern ordinary high water marks of the river in the area of concern. The Court is persuaded by the testimony of McEwan in this regard and as diagrammed

by him on Exhibits AG and AH, as opposed to Gookin's testimony and diagrams, Exhibits 61 and 62. It should be noted that, were there any significant avulsive movements of the river after 1915, by which date all of plaintiffs' land had been eroded away, such avulsive movements could not affect title as the plaintiffs had already lost their land to the river.

## CONCLUSIONS OF LAW

### Jurisdiction

This Court has jurisdiction, 28 U.S.C. §§ 1346(f), 2409a. Venue is proper, 28 U.S.C. § 1402(d).

### Statute of Limitations

P.L. 86–433, 74 Stat. 74, approved April 22, 1960, did not give plaintiffs notice of the adverse claim of the United States. The twelve-year statute of limitations, 28 U.S.C. § 2409a(f), which reads:

"Any civil action under this section shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.",

did not begin to run until October 26, 1966, when the contract authorized by P.L. 86–433 between the United States and the State of Nevada to convey certain lands, including the subject parcel, of the United States to the State of Nevada was recorded in Clark County, Nevada. As this Court has already found, plaintiffs did not know, nor should they have known, of the claim of the United States against the subject parcel by virtue of the enactment of P.L. 86–433 and there was no way that plaintiffs could have known that the subject parcel was included within the land descriptions of the Act of Congress P.L. 86–433.

### Plaintiffs' Claim to Quiet Title to Subject Parcel

This Court has found that plaintiffs' predecessors in interest, the Santa Fe Railroad Company, took title to certain public lands in Arizona by patent from the United States in 1910. This Court also has found that between 1915 and 1934, plaintiffs' land was completely eroded away and that the geographical position of plaintiffs' land was within the modern easterly and westerly ordinary high water marks of the river.

The claim of the United States to the subject parcel by accretion is made not in its sovereign capacity, but is proprietary only. The United States claims title to the subject parcel as the owner of the riparian uplands, i. e., the public domain of the United States in Nevada.

In *Oregon v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977), at pp. 378, 379 and 380, 97 S.Ct. at p. 591, the Supreme Court states:

"Under our federal system, property ownership is not governed by a general federal law, but rather by the laws of the several States. 'The great body of law in this country which controls acquisition, transmission, and transfer of property, and defines the rights of its owners in relation to the state or to private parties, is found in the statutes and decisions of the state.' . . . This is particularly true with respect to real property, . .

"  .   .   .

"In *Shively v. Bowlby*, 152 U.S. 1 [14 S.Ct. 548, 38 L.Ed. 331] the Court canvassed its previous decisions and emphasized that state law controls riparian ownership. The Court concluded that grants by Congress of land bordering navigable waters 'leave the question of the use of the shores by the owners of uplands to the sovereign control of each state, subject only to the rights vested by the constitution in the United States.' 152 U.S. at 58, 14 S.Ct. 545."

Thus, this Court must apply Nevada water law to this case. Although counsel have not cited any Nevada cases directly in point, Nevada does follow common law water law doctrines. *State Engineer v. Cowles Brothers, Inc.*, 86 Nev. 872, 478 P.2d 159 (1970).

Counsel for all parties acknowledge the basic common law doctrines of erosion, accretion and avulsion. Title to land eroded away slowly and imperceptibly by the river is lost. Accretion passes title to the soil added by the river to the riparian uplands. The doctrine of erosion and accretion applies to the earth's surface and the soil particles lying immediately thereunder. Avulsion does not affect title. Avulsive movements of the river do not take away or bestow title. Avulsions are sudden changes in the course of a stream, the sudden abandonment of an old channel and the creation of a new channel.

The United States Supreme Court stated the common law rule in the much-quoted case of *Philadelphia Co. v. Stimson*, 223 U.S. 605 at 624, 32 S.Ct. 340 at 346, 56 L.Ed. 570:

> "It is the established rule that a riparian proprietor of land bounded by a stream, the banks of which are changed by the gradual and imperceptible process of accretion or erosion, continues to hold to the stream as his boundary; if his land is increased he is not accountable for the gain, and if it is diminished he has no recourse for the loss."

The following statement of the common law rule was made in *State v. Bonelli Cattle Company*, 11 Ariz.App. 412, 464 P.2d 999 (*Bonelli* I), at page 1004:

> "Appellant points out the general rule that where a change occurs in the location of the river through a process of erosion or accretion which is a natural and gradual movement of the river, the State would gain title to the bed of the river as it slowly moved losing title to the land that the river has abandoned. The owners of the bank would also lose or gain as the case may be during this slow, imperceptible process. We agree that this is the generally accepted law in regard to accretion in Arizona. *Arizona v. Gunther & Shirley Company*, 5 Ariz.App. 77, 83, 423 P.2d 352 (1967) (review denied 21 March 1967), *State v. Jacobs*, 93 Ariz. 336, 380 P.2d 998 (1963).
>
> " . . . as to avulsive changes neither the State as owner of the river bed nor the parties riparian thereto lose or gain any interest or title to the land as changed. The general law in this regard is summarized in 65 C.J.S. Navigable Waters § 86b (1966):"

In *Oregon v. Corvallis Sand*, supra, the Supreme Court held that the disputed ownership of river bed lands should be decided as a matter of state law and not federal common law and overruled its earlier decision in *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973), (*Bonelli* III), to the extent that the Court in the earlier case had applied federal common law. Except to the extent that it is overruled by *Oregon v. Corvallis Sand*, supra, *Bonelli* III is good law. In *Bonelli* III, the Supreme Court explains the reason for the rule of accretion. At page 326, 94 S.Ct. at page 526, the Supreme Court states:

> "There are a number of interrelated reasons for the application of the doctrine of accretion. First, where lands are bounded by water, it may well be regarded as the expectancy of the riparian owners that they should continue to be so bounded. Second, the quality of being riparian, especially to navigable water, may be the land's 'most valuable feature' and is part and parcel of the ownership of the land itself. *Hughes v. Washington*, [389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530] supra, at 293; *Yates v. Milwaukee*, 10 Wall. 497, 504, [19 L.Ed. 984] (1871). Riparianness also encompasses the vested right to future alluvion, which is an 'essential attribute of the original property.' *County of St. Clair v. Lovingston*, 23 Wall. 46, 68, [23 L.Ed. 59] (1874). By requiring that the upland owner suffer the burden of erosion and by giving him the benefit of accretions, riparinness is maintained. Finally, there is a compensation theory at work. Riparian land is at the mercy of the wanderings of the river. Since a riparian owner is subject to losing land by erosion beyond his control, he should benefit from any addition to his lands by the accretions thereto. which are equally beyond his control."

The instantaneous and obvious caving in of a portion of the river bank, which disintegrates into separate particles and washes away, although sudden and obvious, is gradual and imperceptible in the sense of the rule of erosion and accretion. Rapid and visible erosion of riparian land does not change the process into avulsion. *Nebraska v. Iowa,* 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186 (1891).[8]

8. In *Nebraska v. Iowa,* 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186 (1891), the Court stated, at pages 367–370, 12 S.Ct. at pages 399–400 incl.:

"It is contended by the defendant that this well-settled rule is not applicable to land which borders on the Missouri river, because of the peculiar character of that stream, and of the soil through which it flows, the course of the river being tortuous, the current rapid, and the soil a soft, sandy loam, not protected from the action of water, either by rocks or the roots of trees; the effect being that the river cuts away its banks, sometimes in a large body, and makes for itself a new course, while the earth thus removed is almost simultaneously deposited elsewhere, and new land is formed almost as rapidly as the former bank was carried away. But it has been held by this court that the general law of accretion is applicable to land on the Mississippi river; and, that being so, although the changes on the Missouri river are greater and more rapid than on the Mississippi, the difference does not constitute such a difference in principle as to render inapplicable to the Missouri river the general rule of law." It is true that that case came here on demurrer to a bill, and it was alleged in the bill that the land was formed by "imperceptible degrees," and that the process of accretion "went on so slowly that it could not be observed in its progress; but, at intervals of not less than three or more months, it could be discerned by the eye that additions greater or less had been made to the shore." The state of facts disclosed by this averment was held not to take the case out of the law concerning accretion, and, after referring to some English authorities, it was said: "The doctrine of the English cases is that accretion is an addition to land coterminous with the water, which is formed so slowly that its progress cannot be perceived, and does not admit of the view that, in order to be accretion, the formation must be one not discernible by comparison at two distant points of time." And then was quoted from the opinion in *St. Clair County v. Lovingston,* 90 U.S. 23 Wall. 46 [23:59], these words: "The test as to what is gradual and imperceptible in the sense of the rule is that, though the witness may see from time to time that progress has been made, they could not perceive it while the process was going on."

The case before us is presented on testimony, and not on allegation. But what are the facts apparent from that testimony? The Missouri River is a winding stream, coursing through a valley of varying width, the substratum of whose soil, a deposit of distant centuries, is largely of quicksand. In building the bridge of the Union Pacific Railway Company across the Missouri River, in the vicinity of the tracts in controversy, the builders went down to the solid rock, sixty-five feet below the surface, and there found a pine log a foot and a half in diameter—of course, a deposit made in the long ago. The current is rapid, far above the average of ordinary rivers; and by reason of the snows in the mountains there are two well-known rises in the volume of its waters, known as the April and June rises. The large volume of water pouring down at the time of these rises, with the rapidity of its current, has great and rapid action upon the loose soil of its banks. Whenever it impinges with direct attack upon the bank at a bend of the stream, and that bank is of the loose sand obtaining in the valley of the Missouri, it is not strange that the abrasion and washing away is rapid and great. Frequently, where above the loose substratum of sand there is a deposit of comparatively solid soil, the washing out of the underlying sand causes an instantaneous fall of quite a length and breadth of the superstratum of soil into the river; so that it may, in one sense of the term, be said, that the diminution of the banks is not gradual and imperceptible, but sudden and visible. Notwithstanding this, two things must be borne in mind, familiar to all dwellers on the banks of the Missouri River, and disclosed by the testimony: that, while there may be an instantaneous and obvious dropping into the river of quite a portion of its banks, such portion is not carried down the stream as a solid and compact mass, but disintegrates and separates into particles of earth borne onward by the flowing water, and giving to the stream that color which, in the history of the country, has made it known as the "muddy" Missouri; and, also, that while the disappearance, by reason of this process, of a mass of bank may be sudden and obvious, there is no transfer of such a solid body of earth to the opposite shore, or anything like an instantaneous and visible creation of a bank on that shore. The accretion, whatever may be the fact in respect to the diminution, is always gradual and by the imperceptible deposit of floating particles of earth. There is, except in such cases of avulsion as may be noticed hereafter, in all matter of increase of bank, always a mere gradual and imperceptible process. There is no heaping up at an instant, and while the eye rests upon the stream, of acres or rods on the forming side of the river. No engineering skill is sufficient to say where the earth in the bank washed away and disintegrating into the river finds its rest and abiding place. The falling bank has passed into the floating mass

In *Bonelli* I, the Arizona Court of Appeals states, at page 1005:

"  .  .  .  where the facts are insufficient to establish the manner in which a navigable river has moved there is a presumption that such movement was by accretion rather than by avulsion.  *Nebraska v. Iowa,* 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186 (1892).  *County of St. Clair v. Lovingston,* 90 U.S. (23 Wall.) 46, 23 L.Ed. 59 (1874), *Kitteridge v. Ritter,* 172 Iowa 55, 151 N.W. 1097 (1915).  This presumption is based in logic in that an avulsive change is usually an event of such magnitude that it is normally noted, if not by the riparian landowner, at least by persons in the vicinity and testimony is therefore easy to obtain as to the fact of the avulsive change.  The fact that no evidence is available to indicate the manner of movement is in itself an indication that the movement was slow and imperceptible and therefore accretive rather than avulsive."

In *State v. Bonelli Cattle Co.,* Arizona Supreme Court, 107 Ariz. 465, 489 P.2d 699, (*Bonelli* II), the Court stated, at page 702:

"The rule of law is that in the absence of clear evidence to the contrary, the movement of the river will be presumed to be by erosion, *Arnd v. Harrington,* 227 Iowa 43, 287 N.W. 292; *Kitteridge v. Ritter,* 172 Iowa 55, 151 N.W. 1097."

■ Had this Court not found as it did that plaintiffs' property was in fact eroded away by the river and that the subject parcel was created by accretion from other soils eroded away upstream, and that there was no proof of significant avulsions, the presumption that the river moved by erosion and accretion would have carried the day for the defendants because, even if we view the evidence in the light most favorable to the plaintiffs, the best that could be said is that the river meandered easterly by avulsion, as well as by erosion and accretion.

In view of the foregoing findings of fact and conclusions of law, plaintiffs' prayer that title to the subject parcel be quieted in them must be denied.

## CONFLICTING CLAIMS OF THE DEFENDANTS TO THE SUBJECT PARCEL

Having found against plaintiffs and in favor of defendants, the Court must decide the conflicting claims between the defendants to the subject parcel.

The Court must apply Nevada law to determine whether the title of that part of the subject parcel that lies between the western bank of the permanently channelized river and the modern westerly ordinary high water mark belongs to the State of Nevada or to the United States as the owner of the riparian uplands.

Having found that the subject parcel was formed by accretion from soil eroded away upstream, the United States, as owner of the riparian uplands, now holds title to that part of the subject parcel west of the modern westerly ordinary high water mark as depicted on Exhibit M–1 and as described thereon as the "OLD RIGHT BANK OF COLORADO RIVER."  Both the United States and the State of Nevada now claim title to that part of the subject parcel east of the modern westerly ordinary high water mark and the present west bank of the permanently channelized river.

Bonelli brought suit against the State of Arizona, claiming ownership of the land east of the east bank of the permanently channelized river and the modern easterly ordinary high water mark.  The State of

of earth and water, and the particles of earth may rest one or fifty miles below, and upon either shore.  There is, no matter how rapid the process of subtraction or addition, no detachment of earth from the one side and deposit of the same upon the other.  The only thing which distinguishes this river from other streams, in the matter of accretion, is in the rapidity of the change caused by the velocity of the current;

and this in itself, in the very nature of things, works no change in the principle underlying the rule of law in respect thereto.

Our conclusions are that, notwithstanding, the rapidity of the changes in the course of the channel, and the washing from the one side and on to the other, the law of accretion controls on the Missouri River, as elsewhere;"

Arizona claimed it owned the same property. Bonelli was successful in the trial court, and the Court of Appeals in Arizona in *Bonelli* I affirmed. The Arizona Supreme Court, in *Bonelli* II, reversed and awarded title to the disputed land to the State of Arizona. The Supreme Court of the United States, in *Bonelli* III, decided on December 17, 1973, reversed the Arizona Supreme Court and awarded the disputed property to Bonelli.

Bonelli, like the plaintiffs herein, had taken title by mesne conveyances from the Santa Fe Railroad Company to a parcel of land in Section 3, T 19 N, R 22 W, G&SRM. The Bonelli land was, like the plaintiffs' land, a part of the public land patented to the Santa Fe Railroad in 1910. The Bonelli parcel was situated east of and contiguous to the plaintiffs' land in Section 3. There was no trial in *Bonelli.* The Superior Court decided the case based upon stipulated facts. According to the stipulated facts before the Arizona courts, the river, in its easterly migration, inundated most of the Bonelli parcel except a small portion of the southeast corner of Section 3. Upon permanent channelization in 1960, the river receded from its former modern easterly ordinary high water mark and was confined within the banks of the 400 to 500-foot permanent channel.[9]

This case was tried from January 12, 1977, to and including January 21, 1977. On January 12, 1977, the Supreme Court, in *Oregon v. Corvallis Sand,* overruled in part its prior decision in *Bonelli* III, the Court in *Oregon v. Corvallis Sand* holding that, as already stated, state law and not federal common law governed controversies such as the controversy in *Bonelli* between a state and private interests in lands adjacent to a river.

The effect of *Oregon v. Corvallis Sand* was to reinstate the decision of the Arizona Supreme Court in *Bonelli* II, awarding to the State of Arizona the land claimed by Bonelli.

During the pleading stage of this case and as trial began, counsel believed that the law was as stated in *Bonelli* III, and for that reason the State of Nevada did not claim title to that part of the subject parcel lying between the west bank of the permanently channelized river and the modern westerly ordinary high water mark, as depicted on Exhibit M–1 as "OLD RIGHT BANK OF COLORADO RIVER."

Plaintiffs' counsel, also aware of *Bonelli* III, named the State of Nevada a defendant only because of Nevada's contract to purchase land from the United States, which contract of purchase included the subject parcel. However, at the close of the trial on January 21, 1977, counsel for Nevada, then familiar with *Oregon v. Corvallis Sand,* asserted that the State owned the old river bed, that is, that part of the subject parcel west of the west bank of the permanently channelized river and the modern westerly ordinary high water mark.

The Supreme Court, in *Bonelli* III, 414 U.S. at pp. 317 and 318, 94 S.Ct. at p. 522, stated:

"When the Original Colonies ratified the Constitution, they succeeded to the Crown's title and interest in the beds of navigable waters within their respective borders. As new States were forged out of the federal territories after the formation of the Union, they were 'admitted [with] the same rights, sovereignty and jurisdiction . . . as the original States possess within their respective borders.' *Mumford v. Wardwell,* 6 Wall. 423, 436, [18 L.Ed. 756] (1867). Accordingly, title to lands beneath navigable waters passed from the Federal government to the new States, upon their admission to the Union, under the equal-footing doctrine. See, e. g., *Pollard's Lessee v. Hagan,* 3 How. 212, [11 L.Ed. 565] (1845); *Shively v. Bowlby,* 152 U.S. 1, [14 S.Ct. 548, 38 L.Ed. 331] (1894); *Weber v. Board of Harbor Comm'rs,* 18 Wall. 57, 65–66, [21 L.Ed. 798] (1873).

---

**9.** In Exhibit M–2, the permanently channelized river is shown and there is also depicted the modern easterly ordinary high water mark

called on Exhibit M–2 "OLD LEFT BANK OF COLORADO RIVER." (For another diagram, see Fig. No. 3, p. 1001 of *Bonelli* I, supra.)

"In order for the States to guarantee full public enjoyment of their navigable watercourses, it has been held that their title to the bed of a navigable river mechanically follows the river's gradual changes in course. See *Oklahoma v. Texas,* 268 U.S. 252, [45 S.Ct. 497, 69 L.Ed. 937] (1925). Thus, where portions of a riparian owner's land are encroached upon by a navigable stream, under federal law, the State succeeds to title in the bed of the river to its new high-water mark."

In *Oregon v. Corvallis Sand,* the Court stated, 429 U.S. at pages 370 and 371, 97 S.Ct. at page 587:

"The title to the land underlying the Colorado River at the time Arizona was admitted to the Union vested in the State as of that date under the rule of *Pollard's Lessee v. Hagan,* [3 How. 212, 11 L.Ed. 565] supra. Although federal law may fix the initial boundary line between fast lands and the riverbeds at the time of a State's admission to the Union, the State's title to the riverbed vests absolutely as of the time of its admission and is not subject to later defeasance by operation of any doctrine of federal common law. *Wilcox v. Jackson,* 13 Pet. 498, [10 L.Ed. 264] (1839); *Weber v. Harbor Comm'rs,* 18 Wall. 57, [21 L.Ed. 798] (1873).

"Bonelli's thesis that the equal-footing doctrine would require the effect of a movement of the river upon title to the riverbed to be resolved under federal common law was in error. Once the equal-footing doctrine had vested title to the riverbed in Arizona as of the time of its admission to the Union, the force of that doctrine was spent; it did not operate after that date to determine what effect on titles the movement of the river might have. Our error, as we now see it, was to view the equal-footing doctrine enunciated in *Pollard's Lessee v. Hagan* as a basis upon which federal common law could supersede state law in the determination of land titles. Precisely the contrary is true; in *Pollard's Lessee* itself the equal-footing doctrine resulted in the State's acquisition of title notwithstanding the efforts of the Federal Government to dispose of the lands in question in another way.

"The equal-footing doctrine did not, therefore, provide a basis for federal law to supersede the State's application of its own law in deciding title to the Bonelli land, and state law should have been applied . . . ."

Under the law laid down by the Supreme Court of the United States in both *Bonelli III* and *Oregon v. Corvallis Sand,* when Nevada was admitted to the Union in 1864, Nevada took title to the land underlying the Colorado River in Nevada, that is, from the center line of the Colorado River, the Arizona-Nevada border, to the then modern westerly ordinary high water mark. Nevada has retained such title in the Nevada river bed as it meandered through the years. Nevada did, just before the permanent channelization in 1960, own the river bed land from the Nevada-Arizona boundary, the center line of the river, to the modern westerly ordinary high water mark which this Court found is as depicted on Exhibit M-1 of the "OLD RIGHT BANK OF COLORADO RIVER."

The Nevada Supreme Court, prior to *Bonelli III* and *Oregon v. Corvallis Sand,* had enunciated the same rule. In *State Engineer v. Cowles Brothers, Inc.,* 86 Nev. 872, 478 P.2d 159, at page 160, (1970), the Nevada Supreme Court stated:

"When a territory is endowed with statehood one of the many items its sovereignty includes is the grant from the federal government of all navigable bodies of water within the particular territory, whether they be rivers, lakes or streams. If the body of water . . . is navigable under the definition hereinafter stated, the water and the bed beneath it becomes the property of the state. *United States v. Utah,* 283 U.S. 64, 75, 51 S.Ct. 438, 75 L.Ed. 844 (1931); *Shively v. Bowlby,* 152 U.S. 1, 26, 27, 14 S.Ct. 548, 38 L.Ed. 331 (1894).

'By the American revolution the people of each state in their sovereign character acquired the absolute right to all their

navigable waters and the soil under them. The shores of navigable waters and the soil under them were not granted by the Constitution to the United States, but were reserved to the states respectively. And new states have the same right to sovereignty and jurisdiction over this subject as the original ones.' *County of St. Clair v. Lovingston,* 23 Wall. (90 U.S.) 46, 68, 23 L.Ed. 59 (1874)."

The Colorado River is a navigable river.

In *Bonelli* III the Supreme Court, in footnote 10, 414 U.S. at page 319, 94 S.Ct. at page 522, said:

"The Colorado River has been determined to be a navigable waterway, *Arizona v. California,* 283 U.S. 423 [,51 S.Ct. 522, 75 L.Ed. 1154] (1931), and, once found to be navigable, it remains so. *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 408, [61 S.Ct. 291, 85 L.Ed. 243] (1940)."

In 1921, by statute, *NRS 537.010,* the Nevada Legislature provided:

"All of the Colorado River within the State of Nevada, from the Arizona line on the north to the California line on the south, is hereby declared to be a *navigable stream* for purposes of fixing ownership of the banks and bed thereof, and *title to the lands below the high water mark thereof is held by the State of Nevada,* insofar as they lie within the state." (emphasis added)

In *U. S. v. Claridge,* 416 F.2d 933 (9th Cir. 1969), this circuit affirmed the United States District Court for Arizona and stated, at page 934:

"The District Court concluded, and we agree:

'The ordinary high water mark of a river is a natural physical characteristic placed upon the lands by the action of the river. It is placed there, as the name implies, from the ordinary flow of the river and does not extend to the peak flow or flood stage so as to include overflow on the flood plain, nor is it confined to the lowest stages of the river flow.' 279 F.Supp. [87] at 91.

"This is in accord with holdings of the Supreme Court. *Oklahoma v. Texas,* 260 U.S. 606, 635, 43 S.Ct. 221, 67 L.Ed. 428 (1923); *Alabama v. Georgia,* 64 U.S. (23 How.) 505, 515, 16 L.Ed. 556 (1859); *Howard v. Ingersoll,* 54 U.S. (13 How.) 381, 415, 14 L.Ed. 189 (1851)."

In a third Arizona appellate decision in the *Bonelli* case (not heretofore mentioned in this opinion) handed down by the Supreme Court of Arizona in 1972, 108 Ariz. 258, 495 P.2d 1312, the Arizona Supreme Court held that the ordinary high water mark is the line to which high water ordinarily reaches and is not a line reached by water in flood stages, and is the line below which soil is unfit for vegetation.

Thus, the question is, does Nevada now own only the actual river bed of the permanently channelized river west of the center line? Or does Nevada also own that portion of the subject parcel east of the modern westerly ordinary high water mark to the permanently channelized west bank of the river?

In *Bonelli* II, the Arizona Supreme Court was urged by Bonelli to award the disputed parcel to it upon the theory of "reliction," among others. In dealing with this, the Arizona Supreme Court stated, at pages 702 and 703:

"[12] The plaintiff also argues what it calls the 're-emergence' theory. This occurs where a river which formerly eroded an abutting owner's land recedes so that the eroded land reappears—a process known as reliction. Reliction is an increase of land by a permanent withdrawal or retrogression of a river. We believe, however, that the dredging of the river is an engineering relocation of the waters of the river by artificial means and is not a true case of withdrawal or retrogression.

"We are not unaware that there are jurisdictions which have held that the land to the low water mark of a river or lake belongs to the abutting owners, see e. g., *State Engineer v. Cowles Brothers, Inc.,* Nev., 478 P.2d 159. We think, however, the better rule is that the courts have no authority to give away the title to land which clearly belongs to the state.

Where, as here, the abutting owner's title extends only to the high water mark, and the bed and banks belong to the state, we can find no solid legal reason for concluding that the land below the high water mark to the water's edge belongs to the abutting owners.

"[13] Where a river shifts to a new location as a result of unnatural forces, the state does not lose title to the bed of the stream in the old location. *People ex rel. Dept. of Public Works v. Shasta Pipe and Supply Co.,* 264 Cal.App. 520, 70 Cal. Rptr. 618; *Padgett v. Central and Southern Florida Flood Control District* (Fla.), 178 So.2d 900; *State v. Aucoin,* 206 La. 786, 20 So.2d 136; *Ray v. State* (Tex.Civ. App.), 153 S.W.2d 660; *Wilemon v. City and County of Dallas Levee Imp. Dist.* (Tex.Civ.App.), 264 S.W.2d 543 (cert. den. 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654)."

In *Cowles* (1970), the Nevada Supreme Court held that a 1921 statute, NRS 537.030 which provided that Winnemucca Lake was a navigable body of water and title to the bed thereof was held by the State of Nevada, did not abrogate the common law rule of reliction and held that a strip of land from which the waters of Winnemucca Lake had receded was not owned by the State of Nevada but by the owner of the riparian uplands.

In accord with *Cowles,* this Court now holds that *NRS 537.010,* which reads:
"All of the Colorado River within the State of Nevada, from the Arizona line on the north to the California line on the south, is hereby declared to be a navigable stream for purposes of fixing ownership of the banks and bed thereof, and title to the lands below the high water mark thereof is held by the State of Nevada, insofar as they lie within the state.",
does not abrogate the common law doctrine of reliction and that rule applies to this case.

Under the equal footing doctrine, Nevada, at statehood in 1864, took title to the bed of the river in Nevada, that is, the lands between the modern westerly ordinary high water mark and the center line of the river, the boundary between Arizona and Nevada. *NRS 537.010* merely set forth in statutory form what Nevada had taken under the equal footing doctrine.

Had the waters of the Colorado River simply receded by natural causes, slowly and imperceptibly, from the former modern westerly ordinary high water mark to a narrower river (i. e., the width of the permanently channelized river), this Court, applying Nevada law, would, under *Cowles,* hold that all of the subject parcel west of the narrower river accreted to the United States, the owner of the riparian uplands, but *Cowles* does not apply here. In this case, as in *Bonelli* II, the strip of land in dispute became exposed, not by natural forces and not slowly and imperceptibly over time, but as a result of a sudden deliberate and obvious engineering relocation of the waters within the artificial banks of the permanently channelized river.

Therefore, this Court concludes that the State of Nevada retains title to that portion of the subject parcel east of the modern westerly ordinary high water mark and the west bank of the permanently channelized river.

The defendants are entitled to a decree quieting title in them to their respective portions of the subject parcel.